**No. 26-60184**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

LAUREN STOKES,

*Plaintiff-Appellant,*

*v.*

GLENN BOYCE, CHANCELLOR OF THE UNIVERSITY OF MISSISSIPPI,
IN HIS OFFICIAL AND PERSONAL CAPACITIES,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Mississippi, Oxford Division
No. 3:25-cv-00307-GHD-RP

# BRIEF OF *AMICUS CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION IN SUPPORT OF APPELLANT AND REVERSAL

Greg H. Greubel*
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
greg.greubel@fire.org

*Counsel for *Amicus Curiae* thanks Bhavana Ravala, law student at the University of Texas at Austin School of Law, and Lisandro Berry Gaviria, law student at Harvard Law School, for their contributions to this brief.

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons and entities as described in Local Rule 29.2 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
| --- | --- |
| Foundation for Individual Rights and Expression (FIRE) | *Amicus curiae* |
| Greg H. Greubel | Counsel for *amicus* FIRE |

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus* certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*.

Dated: July 23, 2026

/s/ *Greg H. Greubel*
Greg H. Greubel
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 6

I. Online Backlash, Threats Against the Speaker, and the Self-Created University Staffing Problems Are Not "Disruption" Under *Pickering*. .......... 6

A. Clearly established law from the Supreme Court and this Circuit rejects the heckler's veto .......... 7

B. The district court improperly treated online backlash, anonymous complaints, and threats against Stokes as disruption. .......... 11

II. *McLin* is Limited to Judicial Employees and Does Not Extend to Public Universities. .......... 16

A. The holding in *McLin* was guided by the judiciary's unique interest in impartiality .......... 17

B. Public universities exist to promote discourse on controversial subjects, not penalize it. .......... 18

C. Proper analysis of Stokes' claim should consider the context of public university employment. .......... 21

III. Recent Kirk-Related Cases Confirm *Pickering*'s Demand for Evidence of Disruption. .......... 23

CONCLUSION .......... 26

# TABLE OF AUTHORITIES

## Cases

*Berger v. Battaglia*,
779 F.2d 992 (4th Cir. 1985) .......... 14

*Bevill v. Fletcher*,
26 F.4th 270 (5th Cir. 2022) .......... 4, 11, 23

*Bevill v. Wheeler*,
103 F.4th 363 (5th Cir. 2024) .......... 4–5, 11

*Brown v. Young*,
812 F. Supp. 3d 1217 (N.D. Fla. 2025) .......... 6, 25

*Connick v. Myers*,
461 U.S. 138 (1983) .......... 12

*Cox v. Louisiana*,
379 U.S. 536 (1965) .......... 7

*Crook v. Creston Cmty. Sch. Dist.*,
No. 4:25-cv-00373-RGE-HCA, 2026 WL 1847417 (S.D. Iowa Jan. 13, 2026) .......... 6, 24–25

*Deltondo v. Sch. Dist. of Pittsburgh*,
2026 WL 741848 (W.D. Pa. Feb. 13, 2026) .......... 16

*Edwards v. South Carolina*,
372 U.S. 229 (1963) .......... 7

*Flanagan v. Munger*,
890 F.2d 1557 (10th Cir. 1989) .......... 14

*Forsyth Cnty. v. Nationalist Movement*,
505 U.S. 123 (1992) .......... 7–8

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) .......... 10

*Gray v. Mallory*,
No. 4:25-CV-01057-LPR, 2026 WL 1195833 (E.D. Ark. May 1, 2026) .......... 25

*Graziosi v. City of Greenville*,
775 F.3d 731 (5th Cir. 2015) .......... 12–13

*Hook v. Rave*,
No. 4:25-CV-04188-KES, 2025 WL 2720978 (D.S.D. Sep. 24, 2025) .......... 24

*Jones v. Matkin*,
623 F. Supp. 3d 774 (E.D. Tex. 2022) .......... 5, 19

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .......... 8

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967) .......... 2, 4, 18

*Kinney v. Weaver*,
367 F.3d 337 (5th Cir. 2004) .......... 11, 23

*MacRae v. Mattos*,
145 S. Ct. 2617 (2025) .......... 10

*McLin v. Twenty-First Judicial District*,
79 F.4th 411 (5th Cir. 2023) .......... 4, 16–19, 23

*McVeigh v. Kelly*,
2026 WL 1079693 (N.D. Fla. Apr. 15, 2026) .......... 25

*Melton v. City of Forrest City*,
147 F.4th 896 (8th Cir. 2025) .......... 3–4, 13–14

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968) .......... 2–4, 6–11, 14, 16–18, 20, 22–26

*Porter v. Califano*,
592 F.2d 770 (5th Cir. 1979) .......... 5, 10–11, 16, 23

*Pryor v. Sch. Dist. No. 1*,
99 F.4th 1243 (10th Cir. 2024) ........ 14

*Rankin v. McPherson*,
483 U.S. 378 (1987) ........ 3, 9–10, 13, 16, 22–23

*Reges v. Cauce*,
175 F.4th 1014 (9th Cir. 2026) ........ 5, 13, 19–20, 22

*Reno v. ACLU*,
521 U.S. 844 (1997) ........ 8

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) ........ 22

*Stokes v. Boyce*,
No. 3:25-CV-307-GHD-RP, 2026 WL 689951 (N.D. Miss. Mar. 11, 2026) ........ 3, 15–16

*Stokes v. Boyce*,
No. 3:25-CV-307-GHD-RP, 2026 WL 755189 (N.D. Miss. Mar. 16, 2026) ........ 3

*Thompson v. Ragland*,
23 F.4th 1252 (10th Cir. 2022) ........ 19

*Waters v. Churchill*,
511 U.S. 661 (1994) ........ 12

**Other Authorities**

Aisha Baiocchi,
*Colleges Have Paid Nearly $3 Million to Employees Fired for Comments About Charlie Kirk*, The Chronicle of Higher Education (July 1, 2026) ........ 23

Avery Lotz & Rebecca Falconer,
*$2 million and counting paid out in Charlie Kirk settlements*, Axios (May 28, 2026) ........ 23

David M. Primo,
*Faculty Ideology: Measuring Faculty Viewpoint Diversity Using Campaign Contribution Data* (2026) .... 21

Harry Kalven,
*The Negro and the First Amendment* (1965) .... 7

Nathan Honeycutt,
*Free Expression in a Climate of Self-Censorship: A National Survey of American Law Faculty* (2026) .... 21

## INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to speakers' views through public advocacy, strategic litigation, and *amicus curiae* filings in cases implicating expressive rights. Brief of FIRE as *Amicus Curiae* in Support of Plaintiff-Appellant, *Speech First, Inc. v. Fenves*, No. 19-50529 (5th Cir. filed Aug. 16, 2019); Brief of FIRE as *Amicus Curiae* in Support of Petitioner, *First Choice Women's Resource Centers, Inc. v. Davenport* (U.S. filed Aug 28, 2025). FIRE has a direct interest in this case because it frequently litigates and otherwise advocates on behalf of public university employees retaliated against for exercising First Amendment rights. *See, e.g.*, *Reges v. Cauce*, 175 F.4th 1014 (9th Cir. 2026); *Jones v. Matkin*, 623 F. Supp. 3d 774 (E.D. Tex. 2022). This case implicates issues central to FIRE's work, primarily

[1] No counsel for a party authored this brief in whole or part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. Plaintiff-Appellant consents to this brief's filing. Defendant-Appellee does not oppose its filing but have not consented to the same.

the First Amendment rights of public employees, public universities' special role as institutions committed to free inquiry, and the danger of allowing public employers to treat hostile public reaction as workplace "disruption."

## INTRODUCTION AND SUMMARY OF ARGUMENT

The First Amendment does not allow public universities to condition employment on ideological conformity to the views of the loudest online audience. Public pressure, student complaints, and online outrage may create public-relations challenges, but they do not become *Pickering* disruption unless the speech itself impairs campus operations or working relationships.

Yet the district court in this case permitted a public university—an institution designed to foster debate, *see*, *e.g.*, *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)—to fire an employee for speaking as a private citizen on a matter of national debate simply because online critics demanded punishment. As that decision transforms the standard the Supreme Court established in *Pickering v. Board of Education*, 391 U.S. 563 (1968), into an unconstitutional heckler's veto, this Court should reverse.

Lauren Stokes was an administrative employee in the University of Mississippi's Development Office. On her own time, she reposted commentary about the assassination of Charlie Kirk, a national political controversy with no direct connection to the University or her job duties. She deleted the post within hours and apologized. But online critics reshared it, condemned it, and demanded her termination. The University responded by placing her on leave the next morning and firing her later that day. *Stokes v. Boyce*, No. 3:25-CV-307-GHD-RP, 2026 WL 689951, at *1, *3–4 (N.D. Miss. Mar. 11, 2026); *Stokes v. Boyce*, No. 3:25-CV-307-GHD-RP, 2026 WL 755189, at *1, *4–5 (N.D. Miss. Mar. 16, 2026). The district court treated the online backlash to her social media post as workplace disruption in dismissing her claims. That was an error.

Under *Pickering*, the government must show that an employee's speech meaningfully interfered with workplace operations, discipline, close working relationships, or the employee's ability to perform her duties. *See Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The online outrage, threats against Stokes, and staffing consequences resulting from the University's decision to remove her from work do not satisfy that standard. *See Melton v. City of Forrest City*, 147 F.4th 896, 903 (8th Cir.

2025). If they did, hostile listeners could manufacture the governmental interest needed to silence public employees' speech they dislike. *Id.* And that would undermine their First Amendment rights to the point that they become meaningless.

The district court not only denied Stokes' preliminary injunction but also dismissed the complaint and granted qualified immunity at the motion to dismiss stage, relying primarily on *McLin v. Twenty-First Judicial District*, 79 F.4th 411 (5th Cir. 2023). But unlike the judiciary-employer in *McLin*, public universities are unique among government employers in their mission to foster inquiry, disagreement, and debate. They cannot model those free expression principles by firing employees whenever controversial speech provokes public criticism. *Keyishian*, 385 U.S. at 603.

What's more, *Pickering* is almost always a fact-intensive inquiry, and this Court has long required more than speculation or discomfort before allowing the government to overcome its employee's First Amendment rights at each stage of litigation. *See Bevill v. Fletcher*, 26 F.4th 270, 279 & n.4 (5th Cir. 2022) (*Bevill I*) (affirming denial of motion to dismiss First Amendment retaliation claim); *Bevill v. Wheeler*, 103

F.4th 363, 378–79 (5th Cir. 2024) (*Bevill II*) (affirming denial of summary judgment in First Amendment retaliation claim). Under *Bevill*, Stokes was entitled to discovery on whether her speech actually disrupted University operations.

Qualified immunity was also improper because longstanding precedent gave University officials fair warning that listener hostility is not enough to justify disruption. Since *Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979), this Court has rejected efforts to treat anticipated backlash as a basis for punishing speech, describing that theory as "an interesting new version of the heckler's veto." *Id.* at 778 n.12. Other courts have reached the same conclusion in public-employee and university cases, refusing to equate disfavored viewpoints, complaints, or external pressure with operational disruption. See *Reges v. Cauce*, 175 F.4th 1014 (9th Cir. 2026); *Jones v. Matkin*, 623 F. Supp. 3d 774 (E.D. Tex. 2022). FIRE's recent research shows that viewpoint diversity is already fragile, and that many faculty members withhold their views because they fear retaliation for expressing a dissenting opinion. Allowing public backlash to establish disruption would deepen that chill and entrench ideological conformity across the political spectrum.

Recent cases like this one, involving public employees disciplined for commenting on the assassination of Kirk, illustrate the danger of employers relying on online backlash to justify disruption. Many courts, however, have granted preliminary relief to plaintiffs or denied dismissal in those cases, recognizing that disruption requires actual evidence rather than mere assertion. *See Crook v. Creston Cmty. Sch. Dist.*, No. 4:25-cv-00373-RGE-HCA, 2026 WL 1847417 (S.D. Iowa Jan. 13, 2026); *Brown v. Young*, 812 F. Supp. 3d 1217 (N.D. Fla. 2025).

If affirmed, the decision below will invite public universities to punish employees for unpopular opinions that attract online outrage. In today's polarized climate, that rule will fall hardest on anyone willing to speak against prevailing campus opinion. But the First Amendment does not allow public universities to outsource censorship to an online mob. This Court should reverse.

## ARGUMENT

### I. Online Backlash, Threats Against the Speaker, and the Self-Created University Staffing Problems Are Not "Disruption" Under *Pickering*.

The district court erred at the threshold by treating online backlash, threats against Stokes, and the University's need to find coverage for Stokes' job after placing her on administrative leave as

workplace disruption under *Pickering*. To justify a firing, this Court's precedent requires evidence that employee speech disrupted the public employer's operations—not merely that outsiders objected or that the employer responded to those objections.

### A. Clearly established law from the Supreme Court and this Circuit rejects the heckler's veto.

There is no "heckler's veto" exception to the First Amendment. For decades, the Supreme Court has made clear government officials may not silence or punish otherwise-protected speech merely because it engenders an adverse public reaction. In the 1960s, for instance, the Court repeatedly overturned breach of the peace convictions of civil rights protesters that were based largely on white counterprotesters' hostility to their demonstrations. *See Cox v. Louisiana*, 379 U.S. 536, 544–52 (1965); *Edwards v. South Carolina*, 372 U.S. 229, 234–38 (1963); *see also* HARRY KALVEN, THE NEGRO AND THE FIRST AMENDMENT 140–41 (1965) (first identifying the "heckler veto problem" in this context).

In 1992, the Court invalidated a fee imposed on a white supremacist group that had applied for a permit to hold a rally, explaining that "[s]peech cannot be … punished or banned, simply because it might offend a hostile mob." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S.

123, 134–35 (1992). And when the Court struck down part of the Communications Decency Act on overbreadth grounds, it emphasized the danger that the statute "would confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech." *Reno v. ACLU*, 521 U.S. 844, 880 (1997). In sum, as the Court recently reaffirmed in the context of public education, "under our Constitution," free speech protections do not "readily give way to a 'heckler's veto.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022).

The First Amendment's prohibition on the heckler's veto applies with full force in the public-employment context. Under *Pickering*, the government may discipline an employee for speech as a private citizen on a matter of public concern only when the employer's operational interests outweigh the employee's speech interests. 391 U.S. at 568. That balance requires disruption to the employer's operations, not the mere existence of public criticism, online outrage, or threats directed at the speaker. Treating those third-party reactions as disruption converts *Pickering* into the very heckler's veto the First Amendment forbids—endangering the rights of millions of public workers to share their opinions on the news of the day.

Almost 50 years ago, the Supreme Court held in *Rankin* that it is "clearly established" that public employees have a First Amendment right to share their views on matters of public concern, and that government employers may not discharge them for doing so absent significant disruption to workplace operations. 483 U.S. at 383, 388. There, a county constable office fired a clerical employee for saying at work, after hearing of the attempt to assassinate President Reagan: "If they go for him again, I hope they get him." *Id.* at 380 (internal quotation marks omitted). Applying *Pickering*, the Court held that because there was "no evidence that [the employee's comment] interfered with the efficient functioning of the office," the employer's interest in firing her could not outweigh her "rights under the First Amendment." *Id.* at 389, 392.

The Court faulted the defendant in *Rankin* for rushing to termination without any showing of disruption, explaining that the First Amendment denies government employers the power to "silence discourse, not because it hampers public functions but simply because [they] disagree with the content of employees' speech." *Id.* at 384. Justice Thomas recently relied on this principle in emphasizing that "the

*Pickering-Garcetti* framework plainly forbids" viewpoint discrimination in disguise. *MacRae v. Mattos*, 145 S. Ct. 2617, 2621 (2025) (Thomas, J., statement respecting denial of certiorari).[2]

This Court rejected the heckler's veto in the employment context even before *Rankin*. In *Porter v. Califano*, it reversed a grant of summary judgment to a federal agency because the government had not shown the suspended employee's speech caused the kind of disruption *Pickering* requires. 592 F.2d at 778–79. The employee had distributed a letter accusing supervisors of corruption, and the agency claimed the letter damaged confidence in management and disrupted employee relationships. *Id.* at 774. But this Court held those assertions were too vague and contested to establish, as a matter of law, that the speech "substantially and materially" interfered with agency operations. *Id.* at 773, 778. The Court also rejected discomfort by listeners exposed to the employee's accusations as disruption, describing its proffer as "an interesting new version of the heckler's veto." *Id.* at 778 n.12.

---

[2] In *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), the Supreme Court held that when public employees speak "pursuant to their official duties," their speech does not enjoy First Amendment protections. There is no question in this case that Stokes spoke as a private citizen—off-the-clock, on her own time, and outside of her official duties.

This Court continues to require evidence of real disruption in *Pickering* cases—and rightfully so. In *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) (en banc), where law-enforcement trainers alleged retaliation for testifying against a sheriff, the en banc Court warned that deferring to "unfounded predictions of harm" would allow the government to punish speech arbitrarily "under the guise of preempting disruption." *Id.* at 364. In *Bevill I*, which involved a police captain fired after submitting an affidavit criticizing local criminal-justice officials, this Court emphasized at the motion-to-dismiss stage that the government must identify "real, not imagined, disruption" to its ability to provide public services. 26 F.4th at 279 n.4 (citation modified). And later on summary judgment, it held "hypothetical harms" were "too speculative" to outweigh the employee's speech interest. *Bevill II*, 103 F.4th at 378–79. Those principles should have governed here.

### B. The district court improperly treated online backlash, anonymous complaints, and threats against Stokes as disruption.

The district court departed from the clearly established principles that govern public employee speech. It purported to rely on *Connick v. Myers*, 461 U.S. 138, 152 (1983), *Waters v. Churchill*, 511 U.S. 661, 673

(1994), and *Graziosi v. City of Greenville*, 775 F.3d 731, 741 (5th Cir. 2015), as requiring courts to defer to public employers' predictions of disruption. But each of those cases involved employee speech directed at the workplace or otherwise capable of disrupting the government agency's internal operations.

In *Connick*, the plaintiff caused a "mini-insurrection" at the New Orleans district attorney's office by circulating a questionnaire among colleagues about office transfer policy. 461 U.S. at 140–41. *Waters* centered on the plaintiff's negative, "inappropriate" comments about her supervisor to multiple colleagues at work. 511 U.S. at 664–66. And the *Graziosi* plaintiff made numerous angry posts and comments on Facebook, criticizing the police department she worked for, including on the mayor's public Facebook page. 775 F.3d at 733–34.[3] Thus, the asserted disruption in those cases was not public backlash to employee speech. Rather, the employee's speech *itself* threatened coworker

[3] Notably, *Graziosi* relied on the police department's distinct interest as an employer in "preserving loyalty and close working relationships within the department." 775 F.3d at 740. That rationale does not extend to universities, because "[w]hat counts as a legitimate administrative interest in managing a police department … does not necessarily carry over to the public university setting." *Reges*, 175 F.4th at 1035.

harmony in the context of "close working relationships for which loyalty and confidence are necessary." *Rankin*, 483 U.S. at 388.

That is not what happened here. Rather, the record is far more analogous to that in *Melton v. City of Forrest City*, where the Eighth Circuit reversed summary judgment for a city that fired a firefighter after citizens and city council members sent angry messages objecting to pro-life imagery he posted on Facebook. 147 F.4th at 900–04. The *Melton* court stressed the difference between external reaction and internal disruption: "[T]here was no showing that Melton's post had an impact on the fire department itself. No current firefighter complained or confronted him about it. Nor did any co-worker or supervisor refuse to work with him." *Id.* at 903 (emphasis removed). And other courts have recognized the same distinction.

For instance, the Tenth Circuit in *Flanagan v. Munger*, 890 F.2d 1557 (10th Cir. 1989), rejected a heckler's veto similar to that here, emphasizing that a police department could not "justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive." *Id.* at 1566. That court also squarely held in *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243 (10th Cir. 2024), that under a

*Pickering* analysis, "[e]xpected public reaction [to employee speech] that impacts external relationships does not constitute a detrimental impact and does not weigh in the [government's] favor." *Id.* at 1252. And in *Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985), the Fourth Circuit suggested that "the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships." *Id.* at 1000.

The district court's ruling here collapses this well-established distinction between external public reactions and internal workplace disruption. Stokes reposted—on her own time and on her own social media account—commentary about the assassination of Charlie Kirk, a figure with no apparent connection to the University of Mississippi or its Development Office. *Stokes*, 2026 WL 689951, at *1. The record does not show that any coworker or supervisor refused to work with her because of the post. To the contrary, Stokes's boss texted her sympathetically after learning her post had drawn online attacks. *See* Appellant's Br. 5. Thus, the district court's assertion that Stokes's post was likely to affect

working relationships necessary to the University's functioning was pure speculation. *Stokes*, 2026 WL 689951, at *4.

The district court's other efforts to identify disruption fare no better. It concluded Stokes's post undermined her ability to perform her job. *Id.* at *3–*4. But Stokes was able to report to work the morning after she reposted the comment about Kirk. *Id.* at *1. Any inability to perform her duties thereafter was due to the University placing her on administrative leave at 9:00 a.m., then terminating her later that day. *Id.* As multiple district courts have recently recognized, public employers may not manufacture disruption by removing an employee from work and then rely on that self-created staffing problem to justify the removal. *See Deltondo v. Sch. Dist. of Pittsburgh*, No. 2:22-350, 2026 WL 741848, at *16 (W.D. Pa. Feb. 13, 2026); *Crook*, 2026 WL 1847417, at *10.

Nor could the district court properly treat threats against Stokes as disruption caused by her. The court justified the prediction of disruption by emphasizing that Stokes was attacked online and faced threats to her physical safety, and that University police patrolled near the Development office. *Stokes*, 2026 WL 689951, at *3–*4. But that reasoning punishes the target of third-party threats for being threatened.

*Pickering* does not permit such an inversion of the First Amendment, and the district court erred by relying on cases with distinguishable facts to reach its conclusion.

## II. *McLin* is Limited to Judicial Employees and Does Not Extend to Public Universities.

Supreme Court and Circuit precedent had already made clear that speculative concerns, workplace discomfort, and listener reactions do not establish disruption under *Pickering*. University officials, therefore, had fair warning when they terminated Stokes that backlash alone, untethered to any disruption of university operations, could not justify her dismissal. *See supra* 9–11 (discussing *Porter*, 592 F.2d at 778 n.12; *Rankin*, 483 U.S. at 384).

This Court's decision in *McLin*, which affirmed the early dismissal of a judicial employee's First Amendment claim, did not disturb that settled rule. *McLin* rested on the judiciary's distinctive interest in preserving both the reality and appearance of impartial adjudication. *See* 79 F.4th at 420. The district court erred by extending that reasoning to the fundamentally different setting of a public university.

### A. The holding in *McLin* was guided by the judiciary's unique interest in impartiality.

Reliance on *McLin* here was inapt because the plaintiff worked for Louisiana's Twenty-First Judicial District. *Id.* at 414. In late 2020, she reposted an article on Facebook about a person who had driven through a George Floyd protest, adding her own commentary that included the phrase "#IWillrunYouOver." *Id.* When the post came to the attention of the chief judge, she was fired. *Id.* She then brought a First Amendment retaliation claim. *Id.* at 415. This Court held the chief judge was entitled to qualified immunity because McLin's interests did not outweigh those of the judiciary in *Pickering* balancing, so she was not able to show that the chief judge had violated a clearly established constitutional right. *Id.* at 418–20.

But the Court's holding that *Pickering* balancing meant there was no clearly established First Amendment violation did not rest on generic concerns about public backlash. It was rooted in the judiciary's distinct function. The Court emphasized that McLin's post was particularly harmful because it threatened the court's image of impartiality. *Id.* at 420. And the judiciary's "paramount purpose [of] providing a fair and impartial open forum in which the public may resolve its disputes" and

maintaining public confidence in that function outweighed McLin's speech interest. *Id.* (citation modified). That rationale is specific to courts, while universities operate on an entirely different, and largely opposite, premise.

### B. Public universities exist to promote discourse on controversial subjects, not penalize it.

Public universities exist to foster inquiry, debate, and exposure to competing ideas. The Supreme Court has long described the classroom as "peculiarly the 'marketplace of ideas'" in recognition that "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas." *Keyishian*, 385 U.S. at 603. And that commitment does not stop at classroom instruction. Universities must model tolerance for unpopular speech from students, faculty, and administrative employees rather than punish it because it provokes offense. *See Reges*, 175 F.4th at 1036 ("Higher education may reaffirm students' perspectives, but it can also challenge them. And to have one's views challenged can be unsettling."); *see also Thompson v. Ragland*, 23 F.4th 1252, 1258 (10th Cir. 2022) (explaining that a school may not suppress student speech merely to avoid the discomfort associated with an unpopular viewpoint).

Recent public-university cases confirm as much. Courts have continued to protect campus expression even when officials characterize the speech as offensive, unprofessional, or inconsistent with institutional values. *Reges*, 175 F.4th at 1024, 1036; *Jones*, 623 F. Supp. 3d at 781, 785–86 (denying summary judgment for defendant on First Amendment retaliation claim where college alleged plaintiff's protected speech undermined the administration's decisions). *Reges*, in particular, underscores why *McLin*'s judicial-impartiality rationale should remain limited to its judicial context and not extend to public universities. In *Reges,* the University of Washington encouraged instructors to include a land acknowledgment in their syllabi. 175 F.4th at 1022–23. Professor Stuart Reges objected to the statement as political and factually questionable, then included a parody land acknowledgment in his syllabus. *Id.* at 1023.

The parody triggered complaints and a disciplinary investigation, but the Ninth Circuit held his speech was protected and survived *Pickering* balancing. *Id.* at 1033–39. Reges' speech was on a contested matter of public concern, meaning it was political speech that deserved

"the highest First Amendment protection" regardless of its parodic or offensive nature. *Id.* at 1033–34.

Conversely, the desire to maintain close working relationships was not a strong governmental interest, as the free exchange of ideas—vital in a public university—will necessarily disrupt relationships. *Id.* at 1035–37. For example, the student unrest Reges' speech caused was "an inevitable byproduct of our core First Amendment safeguards in the higher education context." *Id.* at 1036. "Under *Pickering*, therefore, avoiding the disruption on college campuses that necessarily accompanies controversial speech cannot justify the suppression of the very diversity of views that is central to the mission of higher education." *Id.* (citation modified).

FIRE's recent research reveals an academic environment in which viewpoint diversity is already fragile and professors fear speaking up. One FIRE report measuring faculty campaign contributions found that the median faculty political donor falls slightly to the right of Alexandria Ocasio-Cortez and Bernie Sanders.[4] Another found that 56% of law

[4] David M. Primo, *Faculty Ideology: Measuring Faculty Viewpoint Diversity Using Campaign Contribution Data* 9 (2026), https://www.fire.org/research-learn/faculty-

faculty reported feeling unable to express their opinions because of anticipated reactions from students, colleagues, or administrators.[5] This data underscores why public universities may not treat public pressure as a proxy for institutional disruption. In an environment where dissenting viewpoints are already chilled, allowing online backlash to justify discipline would further entrench ideological conformity in institutions that exist to test it.

### C. Proper analysis of Stokes' claim should consider the context of public university employment.

The district court should have recognized that, unlike McLin, Stokes was not a judicial employee whose speech could reasonably affect perceptions of an impartial institution. She was an administrative employee in the development office of a public university. She did not comment on University policy, University leadership, University donors, University students, or her own workplace. She commented as a private citizen, off the clock, on a national political controversy. As *Rankin*

ideology-measuring-faculty-viewpoint-diversity-using-campaign-contribution [https://perma.cc/P6X8-XT6R].

[5] Nathan Honeycutt, *Free Expression in a Climate of Self-Censorship: A National Survey of American Law Faculty* 6 (2026), https://www.fire.org/research-learn/free-expression-climate-self-censorship-national-survey-american-law-faculty [https://perma.cc/DS63-63UK].

recognized, such public-employee private speech receives strong First Amendment protection, especially when it "[comes] on the heels of" heightened attention to an issue of public concern. *Rankin*, 483 U.S. at 386.

*Reges* confirms public universities remain bound by ordinary First Amendment limits when they respond to controversial campus speech. A university may not invoke generalized campus controversy or offense as a substitute for the operational disruption showing that *Pickering* requires. *See Reges*, 175 F.4th at 1035–36. Stokes was neither a student nor a professor, but the constitutional principle is the same. A public university is not a court or police department, and the First Amendment does not permit it to compel ideological conformity from faculty, students, or administrative employees. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 333 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (discussing "compelled participation in educational modules, paper-writing, and presentations").

Given these factual differences, *McLin* cannot bear the weight the district court placed on it in dismissing Stokes' claims. *See* Appellant's Br. 57–58. *Rankin* and *Porter* clearly established that hostile audience reaction cannot justify punishing protected speech, while *Kinney* and

*Bevill* confirm *Pickering* requires evidence of disruption—not speculation, discomfort, or public criticism. *McLin*, tied as it is to the special context of the judiciary, does not alter that settled law.

## III. Recent Kirk-Related Cases Confirm *Pickering*'s Demand for Evidence of Disruption.

The stakes of this case are especially high because Stokes is one of many recent victims of online outrage campaigns. Following Kirk's tragic assassination, social media users across the country demanded consequences against employees who spoke negatively about him, and government employers all too often complied with this pressure.[6] A review of cases involving public employees terminated for Kirk-related social media posts illustrates the facts and reasons that support this Court's reversal of the decision below.

In *Hook v. Rave*, for example, where a public university sought to terminate a professor for a personal Facebook post about Kirk, the court granted a temporary restraining order because the university failed to

[6] Aisha Baiocchi, *Colleges Have Paid Nearly $3 Million to Employees Fired for Comments About Charlie Kirk*, THE CHRONICLE OF HIGHER EDUCATION (July 1, 2026), https://www.chronicle.com/article/colleges-have-paid-nearly-3-million-to-employees-fired-for-comments-about-charlie-kirk [https://perma.cc/Y5GF-ELKK]; Avery Lotz & Rebecca Falconer, *$2 million and counting paid out in Charlie Kirk settlements*, AXIOS (May 28, 2026), https://www.axios.com/2026/05/28/charlie-kirk-settlement-payouts-2-million [https://perma.cc/68WF-6H7R].

present evidence that the post disrupted campus activities, teaching, or university operations. No. 4:25-CV-04188-KES, 2025 WL 2720978, at *1–*2, *4–*6 (D.S.D. Sep. 24, 2025). In doing so, it held that allegations that "hundreds" of calls and messages criticized the post or demanded the professor's removal could not shift the *Pickering* balance in favor of the university. *Id.* at *4.

*Crook v. Creston Community School District* applied the same rule but in the context of a K-12 teacher. 2026 WL 1847417 at *1. There, the school district cited calls, emails, parent complaints, possible student withdrawals, safety concerns, law-enforcement presence, and staff monitoring in claiming disruption. *Id.* at *7. But the court granted preliminary relief because the district had not produced sufficient evidence that the speech disrupted school operations or reasonably threatened to do so. *Id.* at *10, *13. The court stressed that generalized outside outrage cannot substitute for evidence of disruption without "'constitutionalizing a heckler's veto.'" *Id.* at *8 (quoting *Melton*, 147 F.4th at 903).

Several other district courts have denied motions to dismiss in cases involving Kirk-related social media posts by public employees. In

*Gray v. Mallory*, for example, the court denied in part the employer's motion to dismiss, explaining that a complaint need not plead "the absence of disruption" as *Pickering* applies only if the government supplies evidence of disruption. No. 4:25-CV-01057-LPR, 2026 WL 1195833, at *5 (E.D. Ark. May 1, 2026). Similarly, in *McVeigh v. Kelly*, the court denied the employer's motion to dismiss a prospective-relief claim because the *Pickering* balancing test was too fact-intensive to resolve the issue at the pleading stage. No. 4:25-cv-486-AW-MAF, 2026 WL 1079693, at *3 (N.D. Fla. Apr. 15, 2026). And in *Brown v. Young*, the court denied in part the employer's motion to dismiss because the plaintiff had plausibly alleged her First Amendment rights outweighed the employer's alleged interest in avoiding disruption. 812 F. Supp. 3d 1217, 1221–22 (N.D. Fla. 2025).

These cases illustrate the proper *Pickering* inquiry. Even in the context of highly charged political speech, courts required evidence that the speech impaired operations, not merely that outsiders objected. The district court here did the opposite. It treated backlash, threats, and the University's own administrative response as disruption. *Pickering*

requires more, and Stokes was entitled to discovery to prove her claims. The dismissal below was thus in error, and this Court must reverse.

## CONCLUSION

The First Amendment protects public employees from punishment for sharing opinions on matters of public concern on their own time, even if some do not like what they have to say. Because the district court treated hostile third-party reaction as a substitute for evidence of actual disruption, this Court should reverse the judgment below.

Dated: July 23, 2026

/s/ *Greg H. Greubel*

Greg H. Greubel
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
greg.greubel@fire.org

Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,889 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font, with Century Schoolbook 12-point font for footnotes.

Dated: July 23, 2026

/s/ *Greg H. Greubel*
Greg H. Greubel
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 23, 2026, an electronic copy of the Brief of *Amicus Curiae* Foundation for Individual Rights and Expression was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users, and that service of the brief will be accomplished by the CM/ECF system.

Dated: July 23, 2026

/s/ *Greg H. Greubel*

Greg H. Greubel
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION